UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CARL LEE OLIVE | * | CIVIL ACTION NO. 16-559 |
| | * | |
| VERSUS | * | SECTION: "N"(1) |
| | * | |
| CAROLYN W. COLVIN, ACTING | * | JUDGE KURT D. ENGELHARDT |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************* | * | |

REPORT AND RECOMMENDATION

The plaintiff, Carl Lee Olive, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 22) be DENIED; the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 19) be GRANTED; and the matter be REVERSED and REMANDED for further proceedings consistent with this recommendation.

**Procedural Background**

Mr. Olive applied for DIB on April 9, 2013, and for SSI on June 13, 2013, asserting in both applications a disability onset date of December 31, 2011. R. at 135, R. at 142. He alleged the following illnesses, injuries or conditions: hypertension, arthritis, degenerative disc disease, illiterate. R. at 54, 69. On August 16, 2013, his claims were denied by the state agency. R. at 52-83, 86. The Disability Determination Explanations concluded that Mr. Olive's "condition is not severe enough to keep [him] from working" and that although the agency had insufficient

1

information to determine whether Mr. Olive could perform his past work, they "determined that [Mr. Olive] can adjust to other work." R. at 67-68, 82-83.

Mr. Olive obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on July 24, 2014. R. at 26, 99. On August 27, 2014, the ALJ issued an adverse decision. R. at 8-20. The Appeals Council denied review on November 19, 2015. R. at 1-3.

On January 22, 2016, Mr. Olive filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 12, 13). The parties filed cross-motions for summary judgment. (Rec. Docs. 19, 22). Mr. Olive is represented by counsel.

## Decision of the Administrative Law Judge

The ALJ found that Mr. Olive meets the insured status requirements of the Act through June 30, 2015. R. at 10. He found that Mr. Olive has not engaged in substantial gainful activity since December 31, 2011, the alleged onset date. Id. The ALJ found that Mr. Olive has the following severe impairments: disorders of the back-discogenic and degenerative, borderline intellectual functioning, affective disorder, and anxiety disorder. Id. However, the ALJ found that Mr. Olive does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. R. at 11. In making this finding, the ALJ considered listing 1.04 for disorders of the spine, but determined that although Mr. Olive had been diagnosed with mild degenerative disc disease, there was no evidence of compression or limitation of motion. Id. The ALJ also considered listings 12.04, 12.05 and 12.06 for mental impairments, and determined that Paragraph B criteria had not been satisfied because Mr. Olive did not have at least two marked limitations or one marked

limitation and repeated decompensation episodes. Id. The ALJ found that Mr. Olive had only moderate restriction in activities of daily living, moderate difficulties with social functioning, and no episodes of decompensation, although the ALJ found that Mr. Olive had marked difficulties with regard to concentration, persistence or pace. R. at 11-12. In rejecting the IQ score assigned by the consultative examiner, the ALJ noted that Mr. Olive had been assessed as underperforming at the examination. R. at 12. The ALJ also determined that Paragraph C criteria had not been satisfied because he found no medical evidence to support a finding of a documented history of mental health difficulties. Id. Thus, the ALJ found Mr. Olive's spinal impairments and mental conditions did not meet or medically equal the severity of one of the listed impairments. Id. 11-12.

The ALJ assessed Mr. Olive's functional capacity as follows: Mr. Olive can "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to lift and carry 10 pounds frequently and 20 pounds occasionally; to sit one hour or 6 hours out of an 8-hour workday; to stand 30 minutes or 6 hours out of an 8-hour workday; can alternate sitting, standing and walking for 8 hours out of an 8 hour workday excluding morning and afternoon breaks and lunch periods." R. at 13. Additionally, "any job cited must not require continuous bending, stooping or squatting; he is able to walk 4 blocks at one time*; no jobs cited must require reading or writing anything more than the claimant's name; and the claimant is able to perform simple addition and subtraction*." Id. (emphasis added). The ALJ considered the vocational expert's testimony and concluded that Mr. Olive is not able to perform any past relevant work. R. at 19. With regards to Mr. Olive's age, education and work experience, the ALJ concluded that Mr. Olive was 47 at the time of the alleged disability onset date, making him a "younger individual," that he has a marginal education and is able to communicate in English, and that transferability of job

skills was not material to the determination of disability. Id. The ALJ considered Mr. Olive's age, education, work experience and residual functional capacity and found that there are jobs that exist in significant numbers in the national economy that the claimant can perform. Id. The ALJ relied on the vocational expert's testimony about the jobs that a person with Mr. Olive's age, education, work experience and residual functional capacity could perform and the number of such jobs available in Louisiana and nationally. R. at 20. The ALJ determined that the vocational expert's testimony "is consistent with the information contained in the Dictionary of Occupational Titles." Id. Finally, the ALJ concluded that Mr. Olive has not been under a disability as defined in the Act from December 31, 2011 through the date of his decision. Id.

## Statement of Issue on Appeal

Issue No. 1.   Whether the ALJ's Step 5 analysis is supported by substantial evidence because it relies on vocational expert testimony that may be inconsistent with the DOT but does not include an analysis of the inconsistency.

## Evidence in the Record

Because this appeal concerns only the alleged conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"), the Court will summarize only the evidence that is pertinent to that question.

Vocational Expert Cindy Harris testified at the hearing before the ALJ. R. at 48-50. Harris described Mr. Olive's past work as construction worker (heavy, semi-skilled), fry cook (medium, unskilled), cleaner (medium, unskilled), and conveyor heater-off bearer (medium, unskilled)--the job title she found most closely matches Mr. Olive's position at Fed Ex. The ALJ asked Harris to consider a hypothetical individual who is 49 years old, has a 6th grade education, has the previously described work history and has the following limitations:

> the physical ability to lift 10 pounds frequently, 20 pounds occasionally. Sit for one hour at a time or six hours of an eight-hour day minimum. Stand for 30 minutes at

> a time for six hours out of an eight-hour day minimum. Based on testimony this hypothetical person can alternate sitting, standing and walking eight hours out of an eight-hour day excluding morning, afternoon and lunch breaks customarily given in a work place. Any job you cite must not require continuous bending, stooping or squatting. *Any job you cite must not require any reading or writing, however this hypothetical person can do jobs that require simple addition or subtraction*. Based on Exhibit 6F, page two.

R. at 49 (emphasis added). Harris testified that the hypothetical "would include a reduced number of light, unskilled production worker positions." R. at 50. She described "[p]roduction worker positions existing with the state are 1,000 positions, nationally 85,000, representative DOT code 589.687-014. And a reduced number of light, unskilled hand packager positions existing within the state for 1,000 positions, nationally 160,00[sic] . . . DOT number 920.687-146. And, Your Honor, that's all I can identify." Mr. Olive's counsel declined the opportunity to cross examine Harris. Id.  The ALJ did not ask Harris whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). Harris did not testify as to whether her testimony was consistent with the DOT. Harris did not explain why an illiterate person would be able to perform the cited jobs, even though the DOT classifies them as Language Development Level 2, defined in part as being able to "read at rate of 190-215 words per minute" and "[w]rite compound and complex sentences."

The exhibit referenced by the ALJ when describing the reading/writing/calculation limitation is a report by Sheldon Hersh, MD, who performed a consultative examination. R. at 222-24. Dr. Hersh reported on page two that Mr. Olive "could do simple arithmetic slowly. He completed the fifth or sixth grade in a regular and special education classroom. He is unable to read or write." R. a 222.

Carlos Kronberger, Ph.D, also performed a consultative examination. Dr. Kronberger reported that "Mr. Olive was able to spell the words gun, hat, book and look, but not the words

5

stop, play, blue or apple." R. at 216. Dr. Kronberger also reported that Mr. Olive was able to perform 1 of 6 simple calculations. Id. Mr. Olive told Dr. Kronberger that he could go shopping for groceries with a list. R. at 214. Dr. Kronberger administered the Weschler Adult Intelligence Scale-Fourth Edition and assigned Mr. Olive a full scale I.Q. of 55. Id. at 216. He observed that "[t]hese results will need to be reviewed with caution, as the claimant may have been underperforming on tasks." Id.

Social security decision maker Karen August and Lisette P. Constantin, Ph. D., signed the Disability Determination Explanation on Mr. Olive's claim. R. at 83. The findings of fact indicate a teleclaim interview was conducted with Mr. Olive. R. at 73. The notes report that Mr. Olive had difficulty with reading, understanding and answering, that"[h]e could not give much information about school because he didn't know how to spell it or when he attended" and that he "alleges that he cannot read and writes only his name." R. at 74. Dr. Constantin explained that a "[v]alid IQ result [was] not obtained due to under performing on tasks," and concluded that Mr. Olive "clearly" has symptoms and cognitive limitations but does not appear to be psychologically incapacitated by them. R. at 76. Dr. Constantin determined that Mr. Olive would only be moderately limited in his ability to understand, remember, and carry out very short and simple instructions. R. at 79. She also determined that he would only be moderately limited in his ability to maintain attention and concentration for extended periods and only moderately limited in getting along with coworkers and peers. R. at 79-80.

Mr. Olive's Function Report was completed by Vanessa Walker, not by Mr. Olive. R. at 175. In answering how Mr. Olive's illnesses, injuries or conditions limit his ability to work, Ms. Walker noted "can't read, arthritis in back, can't write." R. at 168. To the question, "How well do you follow written instructions?" the response was "can't read." R. at 173.

At the hearing, Mr. Olive described his previous work unloading trucks for Fed Ex. R. at 27-29. The ALJ asked about when Mr. Olive stopped working for Fed Ex. R. at 29. Mr. Olive testified that when he transferred from Dallas to New Orleans, "they wanted to put me in a truck to load the trucks," and that he "couldn't read the boxes and when they found out they said they didn't need [him] anymore." R. at 29-30. The ALJ sought to clarify why Mr. Olive would need to know how the boxes were labeled, and after an inaudible response that was not captured in the transcript, the ALJ concluded "so the truck is sort of segregated by places of delivery, is that correct?" R. at 30. Mr. Olive agreed. Id.  The ALJ asked Mr. Olive if his boss in Dallas had a problem with him not being able to read, and Mr. Olive said yes, but he also said that his boss in Dallas helped him out. R. at 42-43.

At the hearing, the ALJ noted that the record did not include "any formal testing that shows [Mr. Olive] cannot read anything but his name or write anything but his name" and that the record only contained Mr. Olive's own allegations that he could not read or write. R. at 34.

## Law and Analysis

### I. Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the

evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91, 11360 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II. **Entitlement to Benefits under the Act.**

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id. An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

Social Security Ruling 00-4P instructs that "[w]hen there is an apparent unresolved conflict between [vocational expert] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled." Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, SSR 00-4P (Dec. 4, 2000). The ruling goes on to explain that "[a]t the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency." Id. This latter requirement does not appear to require an "apparent" conflict, but obligates that ALJ to determine whether there is a conflict by asking the vocational expert. Where there is a conflict, "[t]he adjudicator must resolve the conflict by determining if the explanation given by the [vocational expert] is reasonable and provides a basis for relying on the [vocational expert] testimony rather than on the DOT information." Id. The ruling explains that "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings." Id. A vocational expert "may be able to provide more specific information about jobs or occupations than the DOT." Id. Indeed, "[t]he value of a vocational expert is that he is familiar with the specific requirements of a particular

occupation, including working conditions and the attributes and skills needed." Fields v. Bowen, 805 F.2d 1168, 1170 (5th Cir. 1986) holding modified by Carey v. Apfel, 230 F.3d 131 (5th Cir. 2000).

The Fifth Circuit Court of Appeals recently made clear that where the ALJ fails to undertake the affirmative responsibility to ask about the existence of a conflict, the ALJ errs. Graves v. Colvin, 837 F.3d 589, 592 (5th Cir. 2016). However, as with other cases where the claimant asserts the ALJ has failed to fully develop the record, such error will only result in reversal if the claimant shows prejudice. Id. at 592-93. "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000) (quoting Ripley v. Chater, 67 F.3d 552, 557 n. 22 (5th Cir. 1995)).

To show prejudice in a DOT inconsistency case, the claimant must establish an inconsistency between the DOT and the vocational expert's testimony. In Graves, for example, the Fifth Circuit affirmed the ALJ's decision although the ALJ had not asked the vocational expert about a conflict because the claimant had not shown that the vocational expert's testimony was inconsistent with the DOT. Id. at 593. Although the Fifth Circuit in Haas v. Barnhart did not explicitly address the issue of prejudice, the court of appeals rejected the claimant's argument that there was a conflict between the vocational expert's testimony and the DOT that the ALJ had failed to explain. 91 Fed. App'x 942, 948 (5th Cir. 2004) (unpublished). The vocational expert had been asked to identify jobs for a person able to perform "sedentary and light work with the additional limitations of the work being simple and repetitive and an assumption that the hypothetical claimant had mild to moderate pain and would have to change positions from time to time to relieve his symptoms." Id. The expert identified two jobs at the sedentary level along with the number of

jobs available and then stated that more of those positions would be available at the light level. Id. For the cited positions, the DOT classified the jobs as having a "light" exertional level. Id. The court of appeals concluded that the DOT provides the maximum requirements for a position and that, therefore, the expert's identification of a lesser number of positions available at the sedentary level was "not necessarily a conflict with the DOT." Id.

Similarly, the Fifth Circuit in Carey v. Apfel held that there was no conflict or that, at best, it was tangential where the vocational expert testified that the claimant could perform certain work with one arm and the DOT description of the cited jobs required fingering and handling. 230 F.3d 131, 143-47 (5th Cir. 2000). The Fifth Circuit explained that the DOT did not require "bilateral fingering ability or dexterity and the vocational expert specifically testified that the jobs of cashier and ticket seller could be performed with the use of only one arm." Id. at 146.

In contrast, a district court in the Western District of Louisiana found an inconsistency where the RFC included a complete restriction on fine manipulation (picking up small objects), but the jobs cited by the vocational expert were listed in the DOT as requiring frequent fingering (ability to pick or pinch). Hallford v. Colving, Civ. Action No. 13-3171, 2015 WL 4229446, at *4-5 (July 9, 2015). Although the ALJ had asked the vocational expert to identify inconsistencies between her testimony and the DOT, she did not identify the inconsistency and as a result, the ALJ did not resolve it. Id. The district court found the ALJ's conclusion that the claimant could perform the listed job was not supported by substantial evidence. Id.

Similarly, a Texas district court found a conflict and prejudice where the ALJ's residual functional capacity limitations included the requirement that the claimant could be subjected to very little background noise or vibration, but the alternative work listed by the vocational expert included four positions, two with a noise level of "4-loud" and two with a noise level of "3-

moderate" according to the DOT. Romine v. Barnhart, 454 F. Supp. 2d 623, 626 (E.D. Tex. 2006). The DOT "characterizes 'loud' noise intensity level as that related to 'can manufacturing department; large earth-moving equipment; heavy traffic." Id. Given the ALJ's findings specific to this claimant, the court found this alternative work listing amounted to a conflict. Id. The ALJ in Romine had not asked the vocational expert whether there was a conflict with the vocational expert's testimony and the DOT and the ALJ's ruling did not include a resolution of the conflict. Id. at 628. Having found a conflict that the ALJ had not inquired into or resolved, the district court in Romine went on to find that claimant had shown prejudice because if the ALJ had asked the vocational expert if there was a conflict, the conflict "would have been discovered," and if it had been discovered, the vocational expert might have changed her opinion or the ALJ "might have concluded that the [vocational expert] could not provide reasonable explanation for the conflict." Id. The court reversed and remanded. Id. at 631.

### III. **Plaintiff's Appeal**.

Issue No. 1.  Whether the ALJ's Step 5 analysis is supported by substantial evidence because it relies on vocational expert testimony that may be inconsistent with the DOT but does not include an analysis of the inconsistency.

There is no dispute that the ALJ did not ask the vocational expert whether her testimony was consistent with the DOT. The ALJ was required to do so by SSR 00-4P. To the extent there was a conflict, there is no dispute that the ALJ did not analyze or resolve the conflict. Instead, the ALJ simply concluded there was none. Nonetheless, these deficiencies will only justify remand if Mr. Olive suffered prejudice. See Graves, 837 F.3d at 592-93. Mr. Olive can only show prejudice if there was an actual conflict between the vocational expert's testimony and the DOT. Id. He alleges that the conflict results from DOT job titles that require reading and writing beyond the RFC limitations that the vocational expert considered.

12

The Court finds there is an apparent[1] conflict here. The ALJ clearly asked the vocational expert to cite jobs that do not require any reading or writing beyond the person's name. R. at 49. And, the vocational expert responded that there were a total of 2,000 jobs in Louisiana and 245,000 available nationally that the individual with the limitations described by the ALJ could perform. Thus, unless she made a mistake (and either misunderstood the ALJ's description or mis-cited the positions available), the vocational expert's testimony is that the cited positions do not require reading or writing beyond the person's name. Specifically, she testified that the ALJ's hypothetical "would include a reduced number of light, unskilled production worker positions" and "a reduced number of light, unskilled hand packager positions." Id. at 50. She cited DOT No. 589.687-014 for "production worker" and DOT No. 920.687-146 for "hand packager."[2] Id. She said the DOT codes she provided were "representative." Id. She also said "that's all I can identify." Id.

The DOT has assigned each of the jobs cited by vocational expert Language Development Level 2. 1 United States Department of Labor & Employment and Training Administration Dictionary of Occupational Titles 500-01 (4th ed. 1991) [hereinafter DOT 1]; 2 United States Department of Labor & Employment and Training Administration Dictionary of Occupational Titles 938 (4th ed. 1991) [hereinafter DOT 2]. As pointed out by Mr. Olive, a DOT Language Development Level 2 requires a person to "read at rate of 190-215 words per minute" and "[w]rite compound and complex sentences." DOT 2, supra, at 1101. Thus, while the vocational expert

---

[1] The Court reads "apparent conflict" as referring to something that appears to be, but may not actually be, a conflict. See Pearson v. Colvin, 810 F.3d 204, 209 (4th Cir. 2015) (reading "apparent" in SSR 00-4p as meaning "seeming real or true, but not necessarily so").
[2] The court notes that the DOT listing for the numbers quoted by the vocational expert and ALJ are "hand cloth folder" and "repack room worker (beverage)." The Court found a DOT listing for "hand packager" with DOT No. 920.587-018. DOT 1, supra, at 386. The Court found a DOT listing for "production helper," which lists "general production worker" as an alternate title, with DOT No. 529.686-070. DOT 2, supra, at 932-33. Like the codes cited by the vocational expert, these positions are classified as "light work" with an SVP level of two and reasoning level of two, however these two positions have a language level of one. A DOT language level of one requires a person to "read at a rate of 95-120 words per minute" and "[p]rint simple sentences." DOT 2, supra, at 1101.

13

concluded that there were jobs available with the listed DOT number that could be performed by a person who cannot read or write, the DOT classifies the cited jobs as requiring a person to have some ability to read and write. This is a conflict.

Unlike the Carey and Haas cases, the conflict here is not tangential. In Carey, the vocational expert's testimony that the claimant could perform certain jobs with the use of only one arm did not conflict with the DOT listing requiring "fingering" in performance of the jobs because the DOT did not require bilateral fingering. 230 F.3d at 146. In contrast, there is no way a person who cannot read or write can perform a job that actually requires a person to read 190-215 words per minute and write compound and complex sentences. If the jobs cited by the vocational expert here do not, in practice, require such reading and writing, she failed to say so on the record. In Haas, the vocational expert testified that a subset of the jobs classified as light by the DOT could be performed by a person limited to sedentary work. 91 Fed. App'x at 948. Here, the vocational expert did not testify that a subset of the jobs requiring a Language Development Level 2 could be performed by a person unable to read or write more than his name.

The Commissioner points out that the job description for the DOT codes cited provide that the worker "[r]ecords lot number and disposition of goods folded on production sheet," "[d]uplicates identification, code and date number found on damaged cartons, using hand stamps," "[p]ositions letters and numbers in hand stamps," "[m]ay keep records of material used." DOT 1, supra, at 500-01; DOT 2, supra, at 938. While these might be minimal reading and writing requirements, there is no testimony or other evidence in the record to support the conclusion that they could be performed by an illiterate person. Moreover, even if these tasks do not rise to the level of reading 195 words per minute or writing complex sentences, this does not alter the fact

14

that the DOT classified the listed jobs as Language Development Level 2. The conflict between the vocational expert's testimony and the DOT required an explanation and resolution.

The Commissioner argues that Mr. Olive previously worked in jobs with equal or higher language development levels than those cited by the vocational expert. While this might be evidence that his previous jobs, in practice, did not require Language Level Development 2,[3] this evidence does not bear on whether the jobs cited by the vocational expert do or do not, in practice, require Language Level Development 2.

The Commissioner's suggestion that Mr. Olive's argument would result in any illiterate person being *per se* disabled is exaggerated. To the extent an ALJ determines that a vocational expert has reasonably explained why a reduced number of DOT listed jobs could be performed by an illiterate person, the ALJ could find available jobs for an illiterate person to perform.

The Commissioner argues that under Carey v. Apfel, Mr. Olive is barred from challenging the ALJ's failure to question the vocational expert on the existence of or explanation for conflicts because he failed to cross-examine the vocational expert at the administrative hearing. As noted above, Carey involved a non-existent or tangential conflict. Accordingly, the waiver principle announced therein is inapplicable here.[4]

---

[3] It might even be evidence that Mr. Olive can actually read and write more than his own name. As the ALJ noted, Dr. Kronberger observed that Mr. Olive may have been underperforming on the intellectual testing performed and Dr. Constantin similarly explained that there was no IQ score because Mr. Olive had been underperforming.

[4] In Carey, the Fifth Circuit explained that "claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." 23o F.3d at 146-47. Although the Fifth Circuit has not addressed the issue, other district Courts have held that the principle applies to implied, not direct conflicts. See Hallford v. Colvin, Civil Action No. 13-3171, 2015 WL 4229446, at *5 n. 3 (W.D. LA July 9, 2015) (rejecting the Commissioner's Carey waiver argument because the case before it involved "an explicit contradiction of the DOT's requirements," while Carey involved "only an *implied* conflict"); Dunn v. Colvin, No. 4:12-CV-496-Y, 2013 WL 4756377, at *5 (N.D. Tex. Sept. 4, 2013) (holding that where there was a direct conflict between the vocational expert's testimony and the DOT, the claimant "did not need to raise the conflict at the hearing or risk waiving it"); Romine, 454 F. Supp. 2d at 629-30 (holding that Carey waiver only applied where there was no direct conflict between the vocational expert testimony and the DOT and remanding where the conflict was "facial and apparent").

The problem here is that there is no evidence, let alone substantial evidence, to support the ALJ's conclusion that the vocational expert's testimony is consistent with the DOT. They clearly conflict. Further, the only evidence supporting the ALJ's conclusion that Mr. Olive can perform the jobs listed by the vocational expert is the vocational expert's testimony that he could do so. This conclusion is called into doubt because her testimony conflicts with the DOT. The testimony cannot, on its own, stand as substantial evidence supporting the ALJ's conclusion. The ALJ did not ask about the existence of an inconsistency or resolve the inconsistency as required by SSR 00-4p, and because there is a conflict, his failure to do so resulted in prejudice to the claimant. In other words, had the vocational expert identified the conflict for the ALJ, he might have determined that the DOT should prevail if the vocational expert's explanation had been unsatisfactory.

The Court does not intend to suggest that, in its opinion, Mr. Olive could not perform the jobs listed by the vocational expert. Indeed, there is no dispute that the DOT lists the maximum job requirements. And the Court agrees that it is perfectly reasonable for the ALJ to reject the DOT job description in favor of the vocational expert's testimony about how a job is performed in specific settings. But here, the vocational expert did not give any specific testimony explaining why the jobs she cited could, in practice, be performed by an illiterate person. The Court cannot assume the existence of evidence that is not in the record. The Court cannot resolve a conflict that the ALJ did not even consider. See Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council.").

## RECOMMENDATION

For the foregoing reasons, the undersigned finds that the ALJ erred and that Mr. Olive was prejudiced by that error. Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 22) be DENIED; the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 19) be GRANTED, and the matter be REVERSED and REMANDED for further proceedings consistent with this recommendation.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 31st day of March, 2017.

_____
Janis van Meerveld
United States Magistrate Judge